**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| INDEPENDENT STAVE COMPANY, LLC, *et al.*, | : : : | Case No. 2:16-CV-31 |
| Plaintiffs, | : : | JUDGE ALGENON L. MARBLEY |
| v. | : : | Magistrate Judge Kemp |
| MERLE BETHEL, *et al.*, | : : | |
| Defendants. | : | |

**OPINION & ORDER**

This matter is before the Court on a Motion for Preliminary Injunction by Plaintiff Independent Stave Company LLC ("ISC") and its subsidiary, American Stave Company LLC ("ASC") (collectively, "ISC" or "Plaintiffs"). (Doc. 7.) ISC, a leading operator of stave mills, which process white oak logs into staves, and cooperages, which turn those staves into barrels and sell the barrels to distilleries, requests that the Court enjoin Defendant Merle Bethel, a former log buyer for ISC's log procurement division, from working for a competitor, Defendant Ohio Valley Veneer, Inc. ("OVV")[1], which also operates stave mills.  Defendant Bethel accepted employment as a log buyer with a subsidiary of OVV in mid-December of 2015, shortly after resigning from ISC.  On January 14, 2016, the Court conducted a Local Rule 65.1 conference. The Court granted Plaintiffs' Motion for Temporary Restraining Order, temporarily enjoined Bethel from working for OVV and its subsidiaries, and conducted a hearing on Plaintiffs' Motion for Preliminary Injunction, which concluded on January 27, 2016.  For the reasons that follow, the Court **GRANTS in part** the Motion for Preliminary Injunction.

---

[1] Bethel's new employer, Taylor Lumber Company, is an affiliated company of OVV.  The Court will refer to Taylor Lumber Company, Ohio Valley Veneer, Inc., and another affiliated company, Ohio Valley Stave, Inc., collectively as "OVV."

1

### I.     BACKGROUND

Bethel was employed from 2007 until 2015 as a log buyer for ISC.  He holds a degree in forestry from Hocking College.  Prior to his employment with ISC, Bethel worked for four years at Superior Hardwoods, where he learned how to select quality white oak logs, although not for use in stave mills, because at that time Superior Hardwoods did not buy stave logs.  At ISC, Bethel was the top log buyer three years in a row.  By the last year of his employment, Bethel's annual income from ISC was approximately $80,000 to $85,000 in salary and bonuses.

Only high quality white oak logs can be used to produce staves (the wood used to make barrels), and ISC has developed confidential and proprietary processes to enable its log buyers to identify these high quality logs.  In his capacity as a log buyer, Bethel had access to:  ISC's log buying standard; log auditing system; grade codes and pricing schedules; log supplier list and contact information for Southern Ohio and Northeast Kentucky, log purchase history database; and log inventory information.

ISC required all its log buyers to sign a non-compete agreement.  In 2009, at a staff meeting at Plaintiffs' headquarters in Missouri, Bethel and ISC's other log buyers were given a copy of the agreement and instructed to sign it or be terminated.  Bethel did not receive additional consideration for signing the agreement other than continued employment.  The agreement restricts employees from working for any competitor nationwide for 18 months after their date of separation from ISC for any reason, and prohibits the use or disclosure of confidential information and trade secrets for any reason.

On November 24, 2015, Bethel resigned from ISC, training his brother as his replacement before he left.  At the time of his resignation, Bethel told his supervisor that he was considering working for OVV.  OVV, which traditionally specialized in processing hardwood-species logs

into lumber for use in construction, has expanded rapidly in the past few years and recently opened a stave mill to make staves and sell them to cooperages. When Bethel announced his intent to resign, Plaintiffs endeavored to convince him to stay with an offer of a salary increase, and when their entreaties were unsuccessful, they sent letters to both Bethel and Edward Robbins, Chief Executive Officer of OVV, reiterating Bethel's obligations under the agreement and announcing their intent to take legal action to enforce the agreement if necessary. On Bethel's last day of work, on December 11, 2015, he told ISC management that he had not yet accepted a new job but was planning to interview with OVV. Plaintiffs later sent two additional letters to Bethel and OVV reiterating their intent to seek enforcement of the agreement. The second letter stated that a failure to respond to that letter would be taken as a representation that Bethel was employed by OVV. Bethel and OVV received the letters and did not respond. OVV hired Bethel at a base salary of $100,000 with no possibility of bonuses, and he worked for OVV as a log buyer for approximately four to five weeks, from mid-December to mid-January, before Plaintiffs filed their Motion for Temporary Restraining Order and the Court granted the Motion.

## II.     LEGAL STANDARD

The Sixth Circuit's four-factor balancing test to determine whether injunctive relief is appropriate under Federal Rule of Civil Procedure 65 requires the Court to weigh the following factors:

(1) whether the movant has a strong likelihood of success on the merits;

(2) whether the movant would suffer irreparable injury without the injunction;

(3) whether issuance of the injunction would cause substantial harm to others; and

(4) whether the public interest would be served by the issuance of the injunction.

3

*Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011 (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)). These four factors "guide the discretion of the district court," but "they do not establish a rigid and comprehensive test." *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982). Whether the combination of the factors weighs in favor of issuing injunctive relief in a particular case is left to the discretion of the district court. *See Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

While the Sixth Circuit has held that "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion," *Leary*, 228 F.3d at 739, the Circuit further clarified that a party "is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits." *Tenke Corp.*, 511 F.3d at 542 (citation omitted). For a plaintiff to receive the requested injunction, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). A plaintiff has "the burden of establishing a clear case of irreparable injury and of convincing the Court that the balance of injury favor[s] the granting of the injunction." *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968).

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

As a preliminary matter, the Court notes that Plaintiffs have brought three claims against Defendants but seek a preliminary injunction only as to the first claim, for breach of contract.

(*See* Compl., Doc. 1 at 15-18.)  Therefore, the Court will not consider the other two claims, for tortious interference with contract and civil conspiracy, for purposes of determining Plaintiffs' likelihood of success on the merits.

The parties agree that pursuant to its terms, the agreement is governed by Missouri law. (Non-Competition, Non-Solicitation and Confidential Information Agreement, Doc. 1-3 at ¶ 10.) Plaintiffs argue that the agreement should be enforced because it was used to protect legitimate business interests and is reasonable in both geographic and temporal scope.  Alternatively, Plaintiffs urges the Court to modify the terms of the agreement if it determines that the geographic or temporal restrictions are broader than necessary to protect Plaintiffs' legitimate business interests.  They argue that such a modification is permitted under Missouri law and also point to a specific provision of the agreement that provides for such a contingency.  (*Id.* at ¶ 11.) Finally, Plaintiffs assert that Bethel received adequate consideration for his promise not to compete, because Missouri law deems the promise to continue employing an at-will employee to constitute adequate consideration for a covenant-not-to-compete.

Defendants argue that OVV is not a competitor of ISC, at least not on the "end-product" side, that is, because OVV does not make barrels but only creates manufactures staves.  (Doc. 21 at 5.)  They interpret the covenant-not-to-compete as applying only to competition for the "end product," and not for suppliers.  Alternatively, even if OVV is a competitor of ISC, Defendants contend that injunctive relief is nevertheless inappropriate because Plaintiffs have not shown a protectable interest, in the form of trade secrets or customer contacts, to warrant such relief. They maintain that buying logs is not a complicated process or trade secret and that the tenets of Plaintiffs' log buying standard are widely known in the industry.  Finally, Defendants urge the Court to find that even if OVV has shown that its log buying standard and associated processes

5

and customer goodwill are trade secrets, there is no evidence that Bethel or OVV has "misused" those trade secrets.

Under Missouri law, restrictive covenants are enforced if they are reasonable under the circumstances and their enforcement serves legitimate protectable interests. *Mayer Hoffman McCann, P.C. v. Barton*, 614 F.3d 893, 908, 906 (8th Cir. 2010). Importantly, non-compete agreements are "not enforceable to protect an employer from mere competition by a former employee, but only to the extent that the restrictions protect the employer's trade secrets or customer contacts." *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 610 (Mo. banc 2006) (citing *Osage Glass v. Donovan*, 693 S.W.2d 71, 73-75 (Mo. banc 1985)); *see also* Mo. Rev. Stat. § 431.202.1(3). A non-compete agreement is reasonable "if it is no more restrictive than necessary to protect the legitimate interests of the employer," and such agreements are enforceable "to the extent they can be narrowly tailored geographically and temporally." *Copeland*, 198 S.W.3d at 610. Courts have noted that "protection of the employer, not punishment of the employee, is the essence of the law" of non-compete agreements. *Id.* at 611. Therefore, the Court will consider four questions in determining Plaintiffs' likelihood of success on the merits: (1) whether ISC and OSC are competitors under the terms of the non-compete agreement; (2) whether Plaintiffs seek to protect trade secrets and/or customer contracts; (3) whether the 18-month temporal limitation and the lack of the geographic limitation in the agreement are reasonable; and (4) whether there was adequate consideration for the agreement.

### 1. Whether ISC and OVV are Competitors

Defendants first advance a somewhat novel argument that OVV and ISC are not, in fact, competitors because they do not compete for the same customers. OVV does not have a

cooperage and, therefore, sells its staves to cooperages. ISC, on the other hand, operates its own cooperages in addition to stave mills, and sells the barrels manufactured in those cooperates to distillers. Defendants insist that the language of the restrictive covenant indicates that a former employee is prohibited, among other things, from soliciting or influencing any of ISC's "customers" and that because the dictionary definition of "customers" means buyers of their product, then "customer" in this agreement necessarily means buyers of the barrels from ISC's cooperages. (*See* Doc. 1-3 at ¶ 1.) Unfortunately for Defendants, the same paragraph of the agreement also prohibits employees from "engag[ing] in any business which is the same as or similar to any business in which Employer is engaged as of the Termination Date, or which is otherwise competitive with any business in which Employer is engaged as of the Termination Date." (*Id.*) Further, the agreement provides that employees shall not "undertake, or engage in, any employment or business activities involving the disclosure or use of Employer's trade secrets or confidential information." (*Id.*) This language is more than sufficient to establish that the agreement was intended to include competitors who buy stave logs, not simply those who sell barrels. And OVV was clearly a competitor of ISC in regards to stave log buying, as Defendants conceded at the hearing when Plaintiff introduced evidence of Bethel's log procurement competition report from the first quarter of 2015, in which he wrote: "[OVV is] close to firing up their stave mill. Road buyers are trying to purchase staves. Not aggressive right now, but will be down the road." (Ex. P-26.) Log procurement competition reports were regularly completed by each of ISC's log buyers in order for the company to keep abreast of the activities of other area stave log buyers. Thus, under the terms of the agreement, ISC and OVV are competitors because both companies buy stave logs.

2. *Legitimate Protectable Interests*

Plaintiffs assert two categories of protectable business interests:  (1) their detailed standards and procedures for identifying, grading, and pricing white oak stave logs, as well as the data and programs associated with their log buying activities; and (2) their goodwill among and knowledge of stave log suppliers.

a. Trade Secrets

Missouri courts have found the following factors should be considered in determining whether given information is a trade secret:

> (1) the extent to which the information is known outside of [the] business;
> (2) the extent to which it is known by employees and others involved in [the] business;
> (3) the extent of measures taken by [the employer] to guard the secrecy of the information;
> (4) the value of the information to [the employer] and to [its] competitors;
> (5) the amount of effort or money expended by [the employer] in developing the information;
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Copeland*, 198 S.W.3d at 610-11 (quoting *Cont'l Research Corp. v. Scholz*, 595 S.W.2d 396, 400-01 (Mo. App. 1980)).  A non-compete agreement should be "no more restrictive than is necessary to protect the legitimate interests of the employer."  *Id.* at 610 (citing *American Pamcor, Inc., v. Klote*, 438 S.W.2d 287, 290 (Mo. App. 1969)).  Additionally, Defendants' argument that Missouri law requires a showing of the "misuse" of trade secrets in order to enforce a non-compete agreement is unavailing.  Under Missouri law, a plaintiff need not show that actual damages have accrued; a showing of a *threat* of unfair competition suffices to enforce a covenant-not-to-compete.  *See Osage Glass*, 693 S.W.2d at 75; *Sigma Chemical Co. v. Harris*, 586 F. Supp. 704, 710 (E.D. Mo. 1984).

Plaintiffs point to cases where Missouri courts have found that confidential business information, including "the details of the employer's operations" and information highlighting "the success or lack of success of the business operations and performance of employees" at certain locations, constituted trade secrets. *Cape Mobile Home Mart, Inc. v. Mobley*, 780 S.W.2d 116, 118-19 (Mo. App. 1989) (also noting that employee was advised that he would have access to a great deal of confidential information that he could not share). Plaintiffs also cite *Sigma Chemical Co. v. Harris*, 586 F. Supp. at 710. ("[Plaintiff's] knowledge of which supplier can provide the right chemical for a particular use at the right price is based upon years of experience and testing by [Plaintiff], and said knowledge is not in the public domain….Moreover, this Court is satisfied that [Plaintiff] has taken adequate steps to keep its purchasing knowledge secret.").

Plaintiffs' case is analogous to *Harris* because they have spent years developing their log buying standard, grade codes, and pricing system and made efforts to keep all of these protocols and processes confidential through marking documents confidential, storing information in password-protected areas of the computer network, and limiting access to their log buyers and top management, all of whom signed non-compete agreements. Although Defendants made much of the fact that log buyers were permitted to share certain details of the log buying standard with their suppliers, Plaintiffs have persuaded the Court that they took significant steps to keep the standard confidential. Even though both sides agree that certain aspects of the standard were generally known to those in the industry, log buyers were instructed not to give the document to suppliers and not to share many of the details surrounding the standard. Although Bethel testified that he did not consult the document on a regular basis, and the Court found Bethel to be a credible witness, Plaintiffs have shown that he was trained on the log buying standard and regularly incorporated its tenets in his work.

9

Plaintiffs have met their burden to show that the information they seek to protect is valued and not widely known to the public and that Bethel would not be prohibited from working in his field if the covenant were enforced. The latter point is especially important because Plaintiffs acknowledged at the hearing that they do not seek to enjoin Bethel from working in the log industry as a whole, but merely in stave operations. The agreement is written broadly to prevent employment with any competitor in seemingly any capacity, but, because Bethel worked only in the specialized capacity of a stave log buyer and the purpose of non-compete agreements is "not to protect an employer from mere competition by a former employee," but only to "protect the employer's trade secrets or customer contacts," *Copeland*, 198 S.W. 3d at 610 (citing *Osage Glass*, 693 S.W.2d at 73-75), the Court will modify the agreement. Bethel will not be enjoined from working at *any* competitor of Plaintiffs in *any* capacity. Rather, the Court will enjoin him from working for OVV as a white oak log buyer or in stave mill operations.[2] He may still seek employment at one of OVV's other businesses, provided that he does not buy white oak logs or work in OVV's stave mill in any capacity. Further, the Court will enjoin Bethel from working as a stave log buyer or in a stave mill in any capacity with any employer. Therefore, he may seek employment at one of the many sawmills or logging outfits in the area, provided that: (1) he does not buy stave logs or work in stave mill operations in any capacity; and (2) if the

---

[2] Although the Court would have considered allowing Bethel to work as a white oak log buyer for OVV provided that he did not buy stave logs, at the hearing, both Plaintiffs and Defendants seemingly agreed that such an arrangement would be unworkable from a practical standpoint. Even though OVV's log buyers purchase white oak logs for many uses other than to make staves, it would apparently be impossible for Bethel to buy any white oak logs without also buying logs to be used in stave mills, because the suppliers commingle the logs. When the buyers purchase the logs, OVV sends some to its stave mill and uses the remaining ones for other purposes.

employer has a stave mill or sells stave logs, he will not work as a white oak log buyer or work in the employer's stave mill in any capacity.[3]

### b. Customer Contacts

Missouri courts have defined "customer contacts" as "essentially the influence an employee acquires over his employer's customers through personal contact." *Copeland*, 198 S.W.3d at 611 (*citing Schmersahl, Treloar & Co., P.C. v. McHugh*, 28 S.W.3d 345, 349 (Mo. App. 2000)). Plaintiff need not show an "actual attempt" by the Defendants to solicit Plaintiff's customers. *Osage Glass*, 693 S.W.2d at 75. Courts have distinguished cases where the defendant had no opportunity to take the plaintiff's business to his new employment, for instance, in a case where the plaintiff solicited business for an adjustment firm and where the persons solicited, who suffered casualty loss, were unlikely to be repeat customers. *See Ibur Assocs. Adjustment Co., Inc. v. Walsh*, 595 S.W.2d 33, 35 (Mo. App. 1980). One Missouri court has also noted that a "list of customers or stock of customers, standing alone, may not have been sufficient for protection," but coupled with the extensive confidential information that constituted a trade secret, warranted enforcing the covenant-not-to-compete. *Mobley*, 780 S.W.2d at 119 (citing *Walsh*, 595 S.W.2d at 35).

At the hearing, Plaintiffs presented evidence that all but one of the suppliers from whom Bethel bought logs during his short stint at OVV were ISC suppliers. But Defendants also

---

[3] Because it is the Court's understanding, based on the evidence, that there are many logging operations and saw mills in Southern Ohio that neither have stave mills nor purchase logs to re-sell to other stave mills, the Court infers that these employers do not face the problem identified by Bethel and Robbins that OVV's buyers purchase commingled logs, which are later used either in stave mills or for other purposes. Therefore, Bethel will be permitted to be a white oak log buyer for employers who do not have stave mills or do not sell stave logs to other stave mills. If he chooses to work for an employer that does have a stave mill or purchase logs to re-sell to other stave mills, then he will be subject to the same conditions as he would be at OVV: not to work in the stave mill in any capacity and not to buy any white oak logs due to the problem of commingled logs.

showed, through the testimony of Bethel and Robbins, that virtually all of these suppliers were previously existing suppliers of OVV.  Moreover, the evidence before the Court indicates that log buyers from OVV, ISC, and other stave mills in the area purchase logs from nearly all the same suppliers. Therefore, the Court finds that Plaintiffs do not have a protectable interest in their customer supplier list standing alone.  Plaintiffs did elicit testimony at the hearing to show that ISC gave funds to Bethel for gifts and hunting trips for suppliers.  But given the relatively small amounts of money involved, the Court is skeptical that Plaintiffs have met their burden to show a protectable interest in their customer contacts in the form of "influence over its customers" that OVV would not have already had, given its pre-existing relationships with nearly all of those customers.  *See Walsh*, 595 S.W.2d at 35.  The Court need not decide whether the customer contacts are protectable, however, because it has found that the employer's trade secrets are a protectable interest.

### 3.  Geographic and Temporal Limitation

Missouri courts have routinely upheld non-compete agreements of greater than 18 months in duration.  *See, e.g.*, *Harris*, 586 F.Supp at 707 (two years); *Shelbina Veterinary Clinic v. Holthaus*, 892 S.W.2d 803, 804 (Mo. App. 1995) (four years); *Watlow Elec. Mfg. Co. v. Wrob*, 899 S.W.2d 585, 587-88 (Mo. App. 1995) (five years).  A temporal restriction of 18 months is reasonable.

This Court has previously found that a covenant without a geographical limitation was unenforceable under Missouri law.  *See MEMC v. Balakrishnan*, No. 2:12-CV-344, 2012 WL 3962905, at *11 (S.D. Ohio Sept. 11, 2012).  There, the Court distinguished covenants that had been upheld under Missouri law without a geographical limitation because those covenants only prohibited the solicitation of a former employer's clients.  *Id.*; s*ee Schott v. Beussink*, 950

12

S.W.2d 621, 627 (Mo. App. 1997) ("The absence of a geographical limitation in this case does not render the restrictive covenant unenforceable" because "the covenant does not prevent employees from practicing in any particular geographical area, it merely prohibits them from soliciting employer's clients."); *Mayer Hoffman*, 614 F.3d at 908.  Other courts have agreed that Missouri law does not allow a nationwide geographical scope in a non-compete agreement "without accompaniment by any specificity of limitation on the class with whom contact is limited." *Sigma-Aldrich Corp. v. Vikin*, 451 S.W.3d 767, 772-73 (Mo. App. 2014).  And even when a non-compete agreement with no geographic limitation or other limitation on coverage has been upheld, other circumstances in those cases are distinguishable from those here, such as executive status and close involvement with top levels of management.  *See, e.g.*, *Superior Gearbox Co. v. Edwards*, 869 S.W.2d 239 (Mo. App. 1993).

Plaintiffs point the Court to *Sigma Chemical Co. v. Harris*, which upheld a restrictive covenant with no geographic restriction because it found that Missouri courts had enforced such covenants "against a defendant whose breach occurred within an area in which restriction would clearly be reasonable, even though the terms of the agreement imposed a larger and unreasonable restraint."  794 F.2d 371, 374 (8th Cir. 1986) (internal quotation marks and citation omitted).  But as the trial court noted in *Harris*, "[t]he test for the reasonableness of the geographic scope of a restrictive covenant is whether it is 'no greater than fairly required for protection,'" and the plaintiff's competitors in that case competed with it on a worldwide basis.  *Harris*, 605 F. Supp. 1253, 1260 (E.D. Mo. 1985), *rev'd in part on other grounds*, 794 F.2d 317 (8th Cir. 1986) (quoting *Scholz*, 595 S.W.2d at 400).  Plaintiffs have not shown that a worldwide restriction is necessary to protect their trade secrets.

13

The Court finds that the lack of a geographical restriction is unreasonable under Missouri law. The Court will exercise its discretion to limit the scope of the agreement to the following counties: Vinton, Hocking, Ross, Jackson, Scioto, Adams, Pike, Lawrence, Gallia, Clermont, Pickaway, and Meigs counties in Ohio; and Carter, Greenup, Lawrence, and Lewis counties in Kentucky.

*4. Consideration*

Plaintiffs argue that Defendant Bethel received adequate consideration in the form of continued employment in exchange for signing the non-compete agreement. Under Missouri law, this is considered sufficient consideration in the at-will employment context. *See Reed, Roberts Assocs., Inc. v. Bailenson*, 537 S.W.2d 238, 241 (Mo. App. 1976). Defendants have not presented any evidence that Defendant Bethel did not know what he was signing or was otherwise coerced into signing the agreement. Therefore, the Court finds that there was adequate consideration for the agreement.

**B. Irreparable Injury**

Turning to the question of whether Bethel's employment with OVV would irreparably harm ISC, Plaintiffs assert that they currently hold a significant competitive advantage over OVV, which they characterize as a "startup" operation because its stave mill opened only last year. Accordingly, Bethel's employment at OVV would give OVV access to confidential and proprietary standards and processes that Plaintiffs have spent years developing, and in light of the significant competition for high quality stave logs, Bethel's employment at OVV would give OVV a short-cut to success in the stave industry and unfairly erode ISC's competitive advantage.

Defendants argue that Plaintiffs have not yet been, and would not be, harmed by Bethel's employment with OVV because Bethel did not have access to any trade secrets that he could

disclose to OVV. Defendants maintain that the process of analyzing and buying white logs can be found on ASC's own websites, customer contacts can be found by the general public in trade journals, and pricing can be determined by simply calling sellers to inquire about their prices.

Having concluded that Plaintiffs are likely to succeed on the merits of their claim because the agreement seeks to protect their trade secrets, the Court finds Defendants' arguments that OVV would not be harmed absent injunctive relief to be unmeritorious.

A plaintiff's harm when a preliminary injunction is denied "is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). "'[T]he loss of trade secrets cannot be measured in money damages' because 'a trade secret once lost is, of course, lost forever.'" *Balakrishnan*, 2012 WL 3962905, at *12 (citing *Novak v. Farneman*, No. 2:10-cv-768, 2010 WL 4643002, at *5 (S.D. Ohio Nov. 9, 2010)).

Because Plaintiffs has presented sufficient evidence to show that Bethel had access to their protectable trade secrets—particularly the Log Buying Standard and associated data and programs—and that Plaintiffs endeavored to keep that information confidential, the Court finds that Plaintiffs would be irreparably harmed absent a grant of injunctive relief.

### C. Harm to Others

The Court must next determine whether granting an injunction would cause "substantial harm to others." *Hunter*, 635 F.3d at 233. In analyzing the harms at issue, the Court considers harm to Defendants as well as any third parties. *Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1008 (S.D. Ohio Feb. 12, 2008).

Plaintiffs contend that any harm to Bethel and OVV will constitute mere inconvenience and temporary financial loss. Bethel will be free to work for other entities in other industries

where he could utilize his general business skills and experience, including within the logging or forestry industries, even at sawmills as long as they do not buy stave logs. Since OVV has nine other log buyers, it will not be greatly affected by an inability to employ Bethel. Finally, because Bethel chose to breach the agreement, and OVV chose to employ him knowing about the non-compete agreement, Plaintiffs insinuate that any harm brought upon them is self-inflicted.

Defendants counter that if he is enjoined from working for OVV, Bethel will not be able to have a job in which he could use his specialized skill set for 18 months. And because he lives in Vinton County, Ohio, a poor area with limited job opportunities where he has lived virtually his entire life, there may not be other job opportunities with comparable salary and benefits available to him. Finally, he contends that he left his job with ISC in part because he had no chance for a meaningful promotion, was forced to travel frequently away from his wife and children, and was offered only one raise in more than eight years of work.

This factor weighs slightly in favor of Defendant Bethel, although not Defendant OVV. OVV has nine other log buyers on which it can rely if enjoined from employing Bethel, but Bethel could suffer serious financial consequences if he cannot work in the stave mill industry, an area where he has developed specialized knowledge. The consequences are even more severe given that he lives in a poor and rural area of Ohio with limited job opportunities. But because Bethel has acknowledged that he knew that he was in violation of the non-compete agreement when he accepted the job with OVV, and because there are more than two dozen sawmills within a 25-mile radius of Bethel's home, Plaintiffs have shown that the harm to Bethel does not substantially outweigh the harm to Plaintiffs.

### D. The Public Interest

Finally, Plaintiffs aver that granting the preliminary injunction will serve the public interest by enforcing important principles of contract law, particularly because Bethel and OVV have "conspired" to breach the agreement that Bethel signed.  Defendants counter that it is not in the public interest to prevent employees from developing his skills and then freely departing to work for another employer.  The public has an interest in both the enforceability of contracts and the ability of employees to work for employers of their choice and advance their careers.  Therefore, this factor does not weigh in favor of either Plaintiffs or Defendants.

### IV. CONCLUSION

For the foregoing reasons, the factors to obtain a preliminary injunction weigh in favor of granting the motion for preliminary injunction, but because the agreement contains no geographic restriction, the Court will modify the agreement to encompass a defined area.  The Court will also modify the agreement to enjoin Bethel only from work in stave mill operations or as a stave log buyer.  Plaintiffs' Motion for a Preliminary Injunction is **GRANTED in part**.  For an 18 month period, Defendant Bethel is **ENJOINED** from working for Defendant OVV as a white oak log buyer or in stave mill operations in any capacity in the following Ohio counties: Vinton, Hocking, Ross, Jackson, Scioto, Adams, Pike, Lawrence, Gallia, Clermont, Pickaway, and Meigs.  For an 18 month period, Defendant Bethel is further **ENJOINED** from working for Defendant OVV as a white oak log buyer or in stave mill operations in any capacity in the following Kentucky counties: Carter, Greenup, Lawrence, and Lewis.  Defendant Bethel is also **ENJOINED** for an 18 month period from working for any employer as a stave log buyer or in stave mill operations in any capacity in the aforementioned Kentucky and Ohio counties.  If he accepts employment with an employer that operates a stave mill or buys stave logs and re-sells

them to a stave mill, he is **ENJOINED** for an 18 month period from working as a white oak log buyer or in the employer's stave mill operations in any capacity in the aforementioned Kentucky and Ohio counties.

The effective date of the preliminary injunction is January 14, 2016, when the Court granted Plaintiffs' Motion for Temporary Restraining Order.

**IT IS SO ORDERED.**

                                       _____s/Algenon L. Marbley_____
                                       **ALGENON L. MARBLEY**
                                       **UNITED STATES DISTRICT JUDGE**

**DATED:  January 29, 2016**